**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| KEVIN P. HARRIGAN, | : | CIVIL ACTION NO. 05-3302 (MLC) |
| | : | |
| Plaintiff, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| KEY BANK, et al., | : | |
| | : | |
| Defendants. | : | |

COOPER, District Judge

Plaintiff, Kevin P. Harrigan, alleges various claims against defendants, Key Bank National Association ("Key Bank"), Michael Butler ("Butler"), KeyCorp Separation Pay Plan (the "Plan"), and KeyCorp (collectively, "defendants"), under (1) the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., and (2) state law.  (Dkt. entry no. 12, Am. Compl.)  Defendants now move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure ("Rule") 56(c). (Dkt. entry no. 34).  Plaintiff opposes the motion.  (Dkt. entry no. 43.)  For the reasons stated herein, the Court will grant defendants' motion for summary judgment.

## BACKGROUND

### I.    The Plan

The Plan governs the circumstances under which a Key Bank employee may receive separation benefits.  (See dkt. entry no. 52, Administrative Record ("Admin. R."), KeyCorp Separation Pay

Plan (the "Plan"), at D0118-31.)[1]  The purpose of the Plan is to ameliorate "the hardship and inconvenience resulting from involuntary unemployment."  (Id. at D0118.)  The provision of the Plan at issue here provides that an employee may be entitled to separation benefits if that individual becomes unemployed due to a "Termination as a Result of a Reduction in Staff."  (Id. at D0122.)  Such a termination is defined as "an involuntary and permanent employment termination that is due to the elimination by an Employer of an Employee's position when there is no other comparable position to which the Employee is offered the opportunity to transfer."  (Id.)

The Plan also provides that KeyCorp funds and is the "Plan Administrator" of the Plan, and has the "sole and absolute discretionary authority and power to carry out the provisions of the Plan".  (Id. at D0126, D0128.)  When KeyCorp decides to deny an employee's claim for separation benefits, it "shall transmit written notice of its decision" to that employee, stating the specific reasons for the denial of the claim.  (Id. at D0126.)

_____

[1] The parties have stipulated that the documents produced under docket entry number 52 constitute the administrative record for the purposes of reviewing plaintiff's claim under Section 502 of ERISA here.  (See dkt. entry no. 52, 5-16-08 Letter from Amy Ventry.)  During a telephone conference call with the parties' counsel on May 20, 2008, the Court gave plaintiff permission to submit an additional response pertaining to the administrative record stipulated to by the parties.  (Dkt. entry no. 51).  Plaintiff has not submitted any such response.

If that employee requests review of that decision, KeyCorp "shall . . . review and render a written decision on the claim containing the specific reasons for the decision including reference to Plan provisions upon which the decision is based." (Id. at D0127.)

## II.  Plaintiff's Employment With and Departure From Key Bank

Plaintiff began his employment with Key Bank in 1998 as Senior Vice President of Risk Management.  (Dkt. entry no. 35, Def. Stmt. of Material Undisputed Facts ("Def. Facts"), at ¶ 5.) By November 2002, plaintiff held the title of President and Chief Operating Officer of Key Home Equity Services ("KHES"), a division of Key Bank.  (Id. at ¶ 9.)

Key Bank reorganized its business structure sometime in late 2002, and created a new organization, Key Consumer Finance.  (Id. at ¶ 23.)  Several divisions of Key Bank were grouped together in this new organization, including KHES.  (Id. at ¶ 24.)  Further, a new position, President of Key Consumer Finance, was created; defendant Butler was selected to fill this position.  (Id. at ¶ 28.)  Butler had previously been employed by Key Bank as President of Business Banking.  (Id. at ¶ 45.)  Butler was plaintiff's immediate supervisor in the new organizational structure.  (Id.)

The parties dispute the nature of Butler and plaintiff's interactions over the following months, but it is apparent that

3

there was disagreement with regard to Butler's expectations as to plaintiff's position and plaintiff's fulfillment of those expectations.  (See dkt. entry no. 36, Def. Br., at 6; dkt. entry no. 43, Pl. Br., at 4.)  Defendants assert that, inter alia, plaintiff "never got on board and was either unable or unwilling to adjust to the new demands of his position as President of KHES." (Def. Br., at 6.)  Plaintiff contends, however, that, inter alia, "Butler and his team took from [plaintiff] the resources that he needed to assist effectively in the restructuring effort" and that his "job functions and resources had been stripped away by Butler, to the point that [plaintiff] was left with no job function other than sales." (Pl. Br., at 4.)

Butler had decided by August 2003 to place plaintiff on a "formal development plan, which is typically a four-month plan by which concrete performance criteria or targets are identified for improvement and then regularly assessed during the four-month period." (Def. Facts, at ¶ 108.)  Butler and another Key Bank employee planned on informing plaintiff of the decision to place him on such a plan on August 7, 2003.  (Id. at ¶ 109.)  Defendants claim that this never occurred, as on this date "[plaintiff] told Butler that he no longer wanted to work at [Key Bank], and handed out a five-page emotionally-charged letter announcing he wanted to leave [Key Bank]".  (Id. at ¶ 110.)

4

That letter, dated August 7, 2003 ("8-7-03 Letter") states, _inter alia_, "[p]lease consider this my official notice of intent to enter into a mutually agreeable separation from KeyCorp." (Admin. R., 8-7-03 Letter From Plaintiff to Butler ("8-7-03 Letter"), at D0002.)  It also indicates that plaintiff believed that (1) his job as President of KHES had been, in effect, eliminated, and (2) he was entitled to separation benefits. (_Id._)

Plaintiff disputes these facts, arguing that, when he met with Butler that day, his "purpose was to initiate a discussion with [Key Bank] on the problems that he had experienced, to determine whether a mutually satisfactory solution could be found."  (Dkt. entry no. 42, Pl.'s Counterstmt. of Contested Facts ("Pl. Facts"), at ¶ 110.)  Further, plaintiff claims that "he never said he was resigning his position.  Butler, on the other hand, first claimed not to recall, and then testified definitively that [plaintiff] had said that he had 'resigned.'" (_Id._)  Plaintiff also argues that "[w]ell after his meeting with Butler[, plaintiff] gave to Karen Blue, a Human Resources manager, copies of a five page letter he had prepared."  (_Id._ at ¶ 111.)  Thus, plaintiff does not deny the existence of the 8-7-03 Letter, nor does he dispute its contents.  (_See_ Pl. Facts; Pl. Br.)

5

Plaintiff's departure from Key Bank was announced to Key Bank employees on August 13, 2003.  (Def. Facts, at ¶ 163.) Allen Wehrhahn ("Wehrhahn") replaced plaintiff in the position of President of KHES; this announcement was made to Key Bank employees on August 14, 2003.  (Id. at ¶¶ 161, 163.)

Key Bank offered plaintiff a Letter Agreement on August 13, 2003 ("8-13-03 Letter Agreement"), with the following terms: (1) six months base salary at plaintiff's annual salary of $232,000, (2) eligibility for an incentive compensation payment of $40,000, (3) a three-month non-compete clause, (4) a one-year non-solicitation of Key Bank customers, (5) six months of outplacement services, and (6) a general release.  (Def. Facts, at ¶ 150; see dkt. entry no. 37, Ventry Decl., Ex. AA, 8-13-03 Letter Agreement.)  On August 27, 2003, after negotiations with plaintiff, Key Bank offered plaintiff a revised Letter Agreement ("8-27-03 Letter Agreement"), which (1) eliminated the three-month non-compete clause, (2) limited the one-year non-solicitation of all Key Bank customers to a specific list of thirty-one customers, (3) offered six months salary, and (4) guaranteed the $40,000 incentive compensation payment.  (Def. Facts, at ¶¶ 154-55; see Admin. R., 8-27-03 Letter Agreement, at D0014-20.)  Plaintiff did not accept the 8-27-03 Letter Agreement, however, and it was withdrawn in September 2003. (Def. Facts, at ¶ 156.)

### III. KeyCorp's Review of Plaintiff's Claim For Separation Benefits

Plaintiff requested benefits under the Plan in September 2003.  (<u>See</u> Admin. R., 9-12-03 Initial Claim Letter from Howard S. Stevens ("9-12-03 Initial Claim Letter"), at D0024.)  In a letter dated September 30, 2003 ("9-30-03 Initial Denial Letter"), KeyCorp denied plaintiff's claim, noting that "[plaintiff] voluntarily terminated his position with Key . . . [b]ecause [plaintiff] voluntarily quit his position with Key, he did not incur the required Termination as a Result of a Reduction in Staff thereby entitling him to a benefit under the Plan." (Admin. R., 9-30-03 Initial Denial Letter, at D0057.)  The Letter cites to the (1) Plan, and (2) 8-7-03 Letter as evidence that plaintiff voluntarily resigned from his position and thus did not qualify for separation benefits under the Plan.  (<u>Id.</u>)

Plaintiff requested review of this denial.  (<u>See</u> Admin. R., 10-27-03 Letter from Charles R. Osinski ("10-27-03 Appeal Letter"), at D0074.)  In a letter dated October 27, 2003 ("10-27-03 Appeal Letter"), plaintiff's counsel argued that plaintiff did not voluntarily resign and that there were facts indicating that (1) plaintiff was terminated from his position, and (2) his position was eliminated.  (<u>Id.</u> at D0074-77.)  The 10-27-03 Appeal Letter also made several allegations as to Butler's conduct during plaintiff's employment and at the time his employment ended.  (<u>Id.</u> at D0076-77.)

KeyCorp again denied plaintiff's claim for separation benefits in a letter dated December 19, 2003 ("12-19-03 Appeal Denial Letter").  (Ventry Decl., Ex. GG, 12-19-03 Appeal Denial Letter.)[2]  KeyCorp cited to the Plan, and noted that the circumstances of plaintiff's departure from Key Bank did not fit within the Plan.  (Id. at 2.)  Specifically, the 12-19-03 Letter cites to (1) plaintiff's 8-7-03 Letter, and (2) the fact that Wehrhahn replaced plaintiff in the position of President of KHES that same month, to support KeyCorp's position that plaintiff was not entitled to separation benefits.  (Id.)

**IV.  The Present Action**

Plaintiff brought this action in June 2005.  (Dkt. entry no. 1.)  Plaintiff filed an amended complaint in January 2006.  (Dkt. entry no. 12.)  The Court dismissed certain claims of the amended complaint in an order filed August 1, 2006.  (Dkt. entry no. 22, 8-1-06 Order.)  The remaining claims of the amended complaint consist of claims (1) pursuant to Sections 502 and 510 of ERISA, and (2) under state law, for (a) breach of contract, (b) breach of the covenant of good faith and fair dealing, (c) intentional infliction of emotional distress ("IIED"), and (d) unjust

---

[2] The 12-19-03 Appeal Denial Letter is also part of the Administrative Record; however, it appears that the second page of the letter was inadvertently omitted.  (See Admin. R., 12-19-03 Appeal Denial Letter, at D0109.)  Thus, the Court will refer to the 12-19-03 Appeal Denial Letter attached as an exhibit to the declaration of Amy L. Ventry.  (See Ventry Decl., Ex. GG.)

enrichment.  (See Am. Compl.)  Defendants now move for summary
judgment as to the remaining claims of the amended complaint.
(Dkt. entry no. 34.)  Plaintiff opposes the motion.  (Dkt. entry
no. 43.)

## DISCUSSION

### I.    Summary Judgment Standard

Rule 56(c) provides that summary judgment is proper if the
pleadings, the discovery and disclosure materials, and any
affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to judgment as a matter of
law.  Id.  The summary judgment movant bears the initial burden
of showing that there is no genuine issue of material fact.
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the
movant has met this prima facie burden, the non-movant must set
out specific facts showing that there is a genuine issue for
trial.  Fed.R.Civ.P. 56(e)(2).  A non-movant must present actual
evidence that raises a genuine issue of material fact and may not
rely on mere allegations.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable
to the non-movant when deciding a summary judgment motion.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986).  At the summary judgment stage, the Court's role is
"not . . . to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original).  A fact is material only if it might affect the action's outcome under governing law.  Id. at 248.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II.  ERISA Section 502 Claim

### A.  Applicable Standard of Review

Section 502 of ERISA permits a plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan".  29 U.S.C. § 1132(a)(1)(B).  The

Court should review a denial of ERISA plan benefits under a <u>de novo</u> standard of review unless the benefit plan gives the administrator or fiduciary of the plan discretionary authority to determine benefits eligibility or construe the plan's terms. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). If the plan confers such discretion, the Court should apply a deferential "arbitrary and capricious" standard.  <u>Id.</u> at 111-12; <u>Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan</u>, 298 F.3d 191, 194 (3d Cir. 2002).  Under the arbitrary and capricious standard, the Court must uphold the plan administrator's decision unless it was without reason, unsupported by substantial evidence or erroneous as a matter of law.  <u>Pinto v. Reliance Stand. Life Ins. Co.</u>, 214 F.3d 377, 392 (3d Cir. 2000); <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 439 (3d Cir. 1997).  "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits." <u>Mitchell</u>, 113 F.3d at 439 (alteration in original) (quotations and citations omitted).

"[I]n reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations."  <u>Kosiba v. Merck & Co.</u>, 384 F.3d 58, 64 (3d Cir.

2004).  Accordingly, an insurer that both funds and administers
benefits is generally acting under a conflict that warrants the
Court applying a heightened form of the arbitrary and capricious
standard of review.  Stratton v. E.I. DuPont de Nemours & Co.,
363 F.3d 250, 254 (3d Cir. 2004); Firestone, 489 U.S. at 115
("[I]f a benefit plan gives discretion to an administrator or
fiduciary who is operating under a conflict of interest, that
conflict must be weighed as a factor in determining whether there
is an abuse of discretion.") (quotation and citation omitted).
Thus, if a potential conflict exists, the Court must employ a
"sliding scale" method and match its degree of scrutiny with the
degree of conflict.  Kosiba, 384 F.3d at 64.  "The burden of
proof is on the claimant to show that a heightened standard of
review is warranted in a particular case."  Marciniak v.
Prudential Fin. Ins. Co. of Am., 184 Fed.Appx. 266, 268 (3d Cir.
2006).

     The Court must consider several structural factors when
employing the "sliding scale" method: (1) the sophistication of
the parties; (2) the information accessible to the parties; (3)
the exact financial arrangement between the insurer and the
company; and (4) the status of the fiduciary, as the company's
financial or structural deterioration might negatively impact the
presumed desire to maintain employee satisfaction.  Stratton, 363
F.3d at 254.  "All of these factors relate to whether the plan is

12

set up so that the administrator has strong financial incentives routinely to deny claims in close cases- in short, whether the administrator's incentives make treating it as an unbiased fiduciary counterintuitive."  Post v. Hartford Ins. Co., 501 F.3d 154, 163 (3d Cir. 2007).

The Court also must examine the process by which the administrator came to its decision to determine whether there is evidence of bias.  Id. at 164.  Demonstrated procedural irregularity, bias, or unfairness in the review warrant a heightened standard of review.  Tobias v. PPL Elec. Utils. Corp., 193 Fed.Appx. 158, 164 (3d Cir. 2006).  "In considering procedural factors, the focus is whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality.  If it has, then the court must decide how much to heighten its scrutiny."  Post, 501 F.3d at 165.

**B.   Determination of Applicable Standard of Review**

The Plan grants KeyCorp "absolute discretionary authority and power" to administer and construe the terms of the Plan. (See Admin. R., Plan, at D0126.)  Therefore, the Court must review the denial of plaintiff's request for benefits under the arbitrary and capricious standard of review.  See Firestone, 489 U.S. at 111-12; Smathers, 298 F.3d at 194.

Because KeyCorp both funded the Plan and determined eligibility under it, however, the Court must use the "sliding

13

scale" method to determine whether a conflict exists warranting application of a heightened form of the arbitrary and capricious standard.  (See Admin. R., Plan, at D0126, D0128.)  See Kosiba, 384 F.3d at 64; Stratton, 363 F.3d at 254.

The fourth sliding-scale factor, which addresses the financial or structural deterioration of the plan fiduciary, is not relevant here.  See Stratton, 363 F.3d at 254.  With respect to the first factor, plaintiff has not argued that he is less sophisticated than KeyCorp here.  (See Pl. Br.)  However, he presumably did not possess a sophisticated understanding of the Plan's benefits, as did KeyCorp, which presumably has handled many claims related to the Plan's benefits.  See Stratton, 363 F.3d at 254.  Thus, this factor weighs in favor of a heightening of the arbitrary and capricious standard.

The second factor, however, does not support a heightening of the standard of review.  Plaintiff has not put forth any evidence indicating, and does not argue, that he did not have complete access to all information pertaining to his claim during the claim review process.  (See Pl. Br.)  See Stratton, 363 F.3d at 254.

The third factor weighs in favor of heightening the standard of review here.  KeyCorp funded and administered the benefits under the Plan, thus providing an incentive to deny employees' claims under the Plan, as what KeyCorp paid "came directly off its bottom line."  (Admin. R., Plan, at D0126, D0128.)  See Post,

14

501 F.3d at 164.  Although a disincentive to deny claims was present, as it is presumed that "employers have at least some self-interest in seeing that benefits are paid fairly", because plaintiff was a former employee, any dissatisfaction on his part with the claims handling process was less likely to translate into a significant financial disincentive for KeyCorp.  See id. at 163-64.

The Court also must determine whether KeyCorp engaged in any procedural irregularities in processing plaintiff's claim. Id. at 164.  Plaintiff has not put forth any evidence indicating that there were "suspicious events" or "procedural anomalies" that raise the Court's concern so as to warrant raising the standard of review on the basis of procedural irregularities. See Marciniak, 184 Fed.Appx. at 268 (internal quotation marks omitted).

The structural factors do warrant a heightening of the arbitrary and capricious standard of review, as (1) KeyCorp's sophistication was greater than plaintiff's, and (2) the financial arrangement provided financial incentive for KeyCorp to deny claims, as discussed supra.  However, there were no procedural irregularities in the processing of plaintiff's claim that would warrant any heightening of scrutiny here, as discussed supra.  Thus, the Court will apply a heightened arbitrary and capricious standard in reviewing the denial of plaintiff's

request for benefits to account for the structural conflicts that may exist here.  See Kosiba, 384 F.3d at 68.

### C.   Review of KeyCorp's Determination

The decision that plaintiff was not entitled to separation benefits under the Plan was not arbitrary and capricious even when reviewed under a heightened standard.  The record supports KeyCorp's decision that the circumstances of plaintiff's departure from Key Bank did not qualify as a "Termination as a Result of a Reduction in Staff" as defined in the Plan.  (See Admin. R., Plan, at D0122.)

Plaintiff's assertions do not support a finding that the decision to deny him separation benefits under the Plan was arbitrary and capricious.  Plaintiff argues that, inter alia, he did not resign on August 7, 2003, and that he merely wanted to "open a discussion that he hoped would lead to an amicable resolution" of a "rocky business relationship".  (Pl. Br., at 9.) Plaintiff also argues that defendants "did not treat [plaintiff] as having resigned" while negotiating the terms of the Letter Agreements with plaintiff, and "chose to negotiate with [plaintiff] . . . [which could be] viewed as a tacit recognition that [plaintiff] might not actually have resigned".  (Id. at 9-10.)

There is evidence in the administrative record, however, supporting the determination that plaintiff did resign.  The 8-7-

16

03 Letter states, <u>inter alia</u>, "[p]lease consider this <u>my</u> official notice of <u>intent</u> to enter into a mutually agreeable <u>separation</u> from KeyCorp." (Admin. R., 8-7-03 Letter, at D0002 (emphasis added).) It was not unreasonable for KeyCorp to view this letter as evidence of plaintiff's intent to resign from his position, despite plaintiff's contentions as to what actually occurred on August 7, 2003.

Even assuming that plaintiff did not resign, moreover, his position was not eliminated so as to entitle him to separation benefits under the Plan. (<u>See</u> Admin. R., Plan, at D0122.) Plaintiff argues that his position was in effect eliminated because "[w]hile [he] retained the title of President of KHES, far more than 50% of his job function was gone". (Pl. Br., at 10.) However, the Plan does not define "elimination" in this manner. (<u>See</u> Plan, at D0122.) Rather, the Plan speaks of "elimination by an Employer of an Employee's position". (<u>Id.</u>) Plaintiff does not dispute that Wehrhahn replaced him in the position of President of KHES shortly after plaintiff's employment ended. (Def. Facts, at ¶¶ 161, 163; Pl. Facts, at ¶¶ 161, 163.) Thus, even assuming plaintiff's assertions as to his job functions are true, his position was not eliminated within the meaning of the Plan. (<u>See</u> Plan, at D0122.)[3]

---

[3] The Court notes that plaintiff refers to statements by a human resources employee, Geri Ann Frisone, to support his assertion that his position was eliminated. (<u>See</u> Pl. Br., at 5,

The Court thus finds that the determination that plaintiff was not entitled to separation benefits under the Plan was not unreasonable, erroneous, or unsupported by substantial evidence, even after applying a heightened arbitrary and capricious standard of review.  See Pinto, 214 F.3d at 393 (explaining that in applying a heightened arbitrary and capricious standard of review, the court is "deferential, but not absolutely deferential"); Mitchell, 113 F.3d at 439.  KeyCorp followed the claims procedure set forth in the Plan in evaluating plaintiff's request, and responded to his appeal appropriately.  (See Admin. R., 9-12-03 Initial Claim Letter, at D0023-24; 9-30-03 Initial Denial Letter, at D0056-57; 10-27-03 Appeal Letter, at D0074-77; Ventry Decl., Ex. GG, 12-13-03 Appeal Denial Letter.)  Thus, the

---

10.)  These statements refer to the alleged fact that a position was considered "eliminated" by Key Bank when more than fifty percent of its job function was removed.  (Id. at 10.)  However, these statements are not part of the Administrative Record used to determine plaintiff's claim.  (See Admin. R.)  "Under the arbitrary and capricious standard of review, the 'whole' record consists of that evidence that was before the administrator when he made the decision being reviewed."  Mitchell, 113 F.3d at 440 (citations omitted).  Evidence that is not part of the administrative record generally is not admissible when determining whether a plan administrator's decision was arbitrary and capricious.  Post, 501 F.3d at 168.  The Court may, however, consider extrinsic evidence when deciding how much to heighten review of a determination if that extrinsic evidence shows potential biases or conflicts.  Id.  Because these alleged statements do not show potential biases or conflicts, the Court will not consider them.  See id. at 168-69 (noting that extrinsic evidence could not be considered if only relevant to whether administrator "reached the right decision").

18

Court finds that plaintiff has failed to rebut the defendants'
prima facie showing that KeyCorp's determination was reasonable
and the process utilized to reach this determination was proper.
<u>See</u> <u>Pinto</u>, 214 F.3d at 393 (stating that in applying a heightened
arbitrary and capricious standard of review a court must "look
not only at the result - whether it is supported by reason - but
at the process by which the result was achieved").  Defendants
therefore are entitled to summary judgment as to plaintiff's
claim pursuant to Section 502 of ERISA.

**III.  ERISA Section 510 Claim**

    **A.  Legal Standards**

    Section 510 of ERISA makes it unlawful for "any person to
discharge, fine, suspend, expel, discipline, or discriminate
against a participant or beneficiary for exercising any right to
which he is entitled under the provisions of an employee benefit
plan . . . or for the purpose of interfering with the attainment
of any right to which such participant may become entitled under
the plan . . ."  29 U.S.C. § 1140.  This provision "prevent[s]
unscrupulous employers from discharging or harassing their
employees in order to keep them from obtaining vested pension
benefits."  <u>Haberern v. Kaupp Vascular Surgeons Ltd. Defined
Benefit Pension Plan</u>, 24 F.3d 1491, 1502-03 (3d Cir. 1994)
(quotations and citations omitted).

A plaintiff must demonstrate that a defendant had the specific intent to violate Section 510 to succeed on a Section 510 claim. Makenta v. Univ. of Pa., 88 Fed.Appx. 501, 504 (3d Cir. 2004). This requires the plaintiff to show that the defendant made a conscious decision to interfere with the plaintiff's attainment of benefits under the Plan. Id. The plaintiff may use both direct and circumstantial evidence to establish specific intent. Id.

Direct evidence in the context of a Section 510 claim must demonstrate that decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision. Breon v. Waypoint Ins. Group, Inc., No. 06-2204, 2008 WL 906488, at *4 (M.D. Pa. Mar. 31, 2008). This is a high hurdle for a plaintiff to meet because direct evidence must reveal a sufficient discriminatory or illegal animus making it unnecessary to rely on any presumption from the prima facie case to shift the burden of production. Id.

If the plaintiff offers no direct evidence that a violation of Section 510 has occurred, then the Court is to apply a shifting burden analysis. Makenta, 88 Fed.Appx. at 504. The plaintiff first must show that the defendant engaged in prohibited employer conduct taken for the purpose of interfering with the attainment of any right to which the employee may become entitled under ERISA. Id. If the plaintiff makes such a

20

showing, the burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the conduct.  Id.  If the defendant carries the burden, plaintiff must then persuade the Court by a preponderance of the evidence that the defendant's reason is pretextual.  Id.

A plaintiff's (1) vague allegations of malicious termination, and (2) own subjective belief as to the defendant's motives are insufficient to support a claim for a violation of Section 510.  Id. at 505; Grogan v. Duane, Morris & Heckscher, No. 90-4105, 1991 WL 98888, at *4 (E.D. Pa. June 4, 1991). Further, proof of an incidental loss of benefits as a result of a termination will not constitute a violation of Section 510. Makenta, 88 Fed.Appx. at 505.  Although economic benefits enjoyed by defendants when an employee is discharged may be circumstantial evidence of specific intent, particularly when other circumstances make that discharge suspicious, if the only "evidence that an employer specifically intended to violate [Section 510] is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged [the employee]."  Id. (quotation and citations omitted).

**B.   Legal Standards Applied Here**

Plaintiff has not established, either by direct or circumstantial evidence, that defendants made a conscious decision to interfere with his attainment of benefits under the Plan.  Id. at 504.  As discussed supra, to attain separation benefits under the Plan, plaintiff's position had to have been eliminated.  (Admin. R., Plan, at D0122.)  Plaintiff also has not alleged, nor is there any evidence to show, that Wehrhahn was hired to replace plaintiff in his position specifically for the purpose of interfering with his attainment of rights under the Plan.  (See Pl. Br.)  It is undisputed that Wehrhahn was hired because "the urgent needs of the KHES business required someone to step immediately into the role".  (Def. Facts, at ¶ 162; Pl. Facts, at ¶ 162.)  Plaintiff merely indicates that the choice of Wehrhahn as his replacement was "odd" because Butler had previously rejected Wehrhahn for a different sales position, and "was now being placed into a position limited to sales responsibilities."  (Pl. Facts, at ¶ 162; Pl. Br., at 6.)  This vague allegation or subjective belief as to why Wehrhahn was hired to replace him is insufficient to support his Section 510 claim.  See Makenta, 88 Fed.Appx. at 505; Grogan, 1991 WL 98888, at *4.

The only other circumstantial evidence that possibly may support plaintiff's Section 510 claim here is the fact that

defendants would have had to pay approximately $75,000 more to plaintiff under the Plan than under the proposed 8-27-03 Letter Agreement that plaintiff rejected, and thus, defendants may have had an incentive to interfere with plaintiff's eligibility under the Plan by classifying his departure as a resignation rather than a termination.  (<u>See</u> dkt. entry no. 48, Def. Reply Br., at 7.)  However, this piece of evidence alone, without more, is insufficient to support plaintiff's Section 510 claim.  <u>See</u> <u>Makenta</u>, 88 Fed.Appx. at 505.

Plaintiff has not presented any facts here that make the circumstances surrounding his departure from employment at Key Bank, and the subsequent dealings of the parties, sufficient to support a Section 510 claim.  (<u>See</u> Pl. Br.)  <u>See</u> <u>id.</u>  Nor did plaintiff have any contractual right to separation benefits other than under the Plan; the proposed 8-27-03 Letter Agreement was offered by defendants voluntarily, as discussed <u>infra</u> in Section IV, subsection A.

23

## IV. Breach of Contract Claims[4]

### A. Payment of Additional Compensation and Benefits to High Level Departing Executives

Key Bank does typically enter into Letter Agreements providing transition pay and other benefits to departing "higher-level [Key Bank] executives", sometimes as an alternative to providing such pay and benefits under the Plan.  (Def. Facts, at ¶ 122.)  Plaintiff alleges that these Letter Agreements often "involve payments and benefits that are greater than those offered under the [Plan]."  (Am. Compl., at ¶ 65.)  Plaintiff was offered the 8-27-03 Letter Agreement, but declined to accept it.  (Def. Facts, at ¶ 156.)  Thus, as plaintiff did not accept the 8-27-03 Letter Agreement, it cannot form the basis of a contract claim.  Plaintiff does not point to any other written agreement providing additional or different separation benefits to departing high level executives.  (See Pl. Facts; Pl. Br.)

To the extent that plaintiff is alleging that there is an implied oral employment contract as to these benefits here, plaintiff must show that there was (1) an oral policy or practice, which (a) contained an express or implied promise concerning the terms and conditions of employment, and (b) was

---

[4] Plaintiff is a New Jersey citizen, and defendants appear to be citizens of Ohio only.  Thus, the Court has jurisdiction under 28 U.S.C. § 1332, and will address the state law claims.  Cf. 28 U.S.C. § 1367(c)(3).  The Court also has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

definitive, established, and company-wide, and (2) oral statements made pursuant to the policy or practice (a) which constituted an accurate representation of the oral policy or practice, and (b) were made by a supervisor authorized to make such statements.  <u>Fischer v. Allied Signal Corp.</u>, 974 F.Supp. 797, 808 (D.N.J. 1997).  Plaintiff does not make such a showing; thus, to the extent that plaintiff argues that there is an implied oral employment contract as to these benefits, this claim fails.  <u>See id.</u>

## B.    Stock Options

Several agreements appear to govern the stock options granted to plaintiff here.  (<u>See</u> Admin. R., 11-21-02 KeyCorp Stock Option Grant Agreement ("11-21-02 Stock Option Agreement"), at D0034-36; 9-22-99 KeyCorp Non-Qualified Grant Agreement Performance Option ("9-22-99 Stock Option Agreement"), at D0040-41); Ventry Decl., Ex. J, 3-13-03 Amended and Restated 1991 Equity Compensation Plan ("3-13-03 Equity Plan").)[5]  These plans specify the dates upon which the stock options vest and provide for an acceleration of the vesting of the stock options in limited circumstances, none of which are applicable here.  (<u>See id.</u>)

---

[5] There also appears to be an Amended KeyCorp Non-Qualified Grant Agreement Performance Option dated May 16, 2001. (<u>See</u> Admin. R., 5-16-01 Amended KeyCorp Non-Qualified Grant Agreement Performance Option, at D0038-39.)  However, this agreement does not have any signatures on it.

Plaintiff asserts that (1) his discussion with his former supervisor indicates that options have been accelerated for departing executives, and (2) with regard to other departed executives, "defendants say clearly that options were not accelerated, with [plaintiff's former supervisor] they say that the separation documents do no[t] reflect any accelerated vesting, which is an entirely different thing."  (Pl. Br., at 14-15.)  Plaintiff argues that this creates a genuine issue of material fact as to whether there is a viable contract claim relating to stock options.  (Id.)

Plaintiff appears to argue that there was an implied oral employment contract as to changes in the vesting of his stock options based upon the statements of his former supervisor, separate from the written contracts discussed supra.  (Id.) Assuming arguendo these statements were admissible here, some statements made by one person does not establish that this practice was a definitive, established, company-wide policy or practice.  See Fischer, 974 F.Supp. at 808.  Moreover, plaintiff has not shown that (1) these statements constituted an accurate representation of policy, and (2) his former supervisor was authorized to make these statements of policy.  See id.

### C.  Incentive Compensation

Incentive compensation is governed by the 2002 KeyCorp Incentive Compensation Plan ("Incentive Compensation Plan").

26

(Def. Br., at 28-29; <u>see</u> Ventry Decl., Ex. L, Incentive
Compensation Plan.)  Under that plan, plaintiff had to have been
employed by KeyCorp at the time payment was made, after the close
of a calendar year.  (Def. Br., at 29; Incentive Compensation
Plan, at 9.)  Plaintiff was not employed by KeyCorp at the time
payment under this plan would have been made.  (Def. Br., at 29.)
Thus, he was not entitled to incentive compensation for work
performed during 2003.  (<u>See</u> Incentive Compensation Plan, at 9.)

To the extent that plaintiff's contract claim for incentive
compensation is based on the $40,000 he was offered in the 8-27-
03 Letter Agreement, this claim fails because plaintiff did not
accept the 8-27-03 Letter Agreement, as discussed <u>supra</u>.  (Def.
Facts, at ¶ 156.)

**V.   Breach of Covenant of Good Faith and Fair Dealing**

**A.   Legal Standards**

The covenant of good faith and fair dealing is implied in
every contract in New Jersey, and thus, there must be a contract
between the parties for this Court to conclude that such covenant
existed and that it was breached.  <u>Space v. BRPM Towing Serv.,
Inc.</u>, No. 07-947, 2007 WL 4570157, at *6 (D.N.J. Dec. 21, 2007).

The plaintiff also must show bad faith on the part of the
defendant to succeed on this claim.  <u>World Finer Foods, Inc. v.
Archway Cookies, LLC</u>, No. 03-1277, 2007 WL 3349450, at *6 (D.N.J.
Nov. 7, 2007).  Bad faith "usually exists only where the

defendant acts with the objective of preventing the plaintiff from receiving its reasonably expected fruits under the contract."  <u>Id.</u>

### B.  Legal Standards Applied Here

Plaintiff does not have a viable contract claim as to additional compensation for departing high level executives, as discussed <u>supra</u>; thus, this claim cannot support a claim of breach of the covenant of good faith and fair dealing.  <u>See Space</u>, 2007 WL 4570157, at *6.  Plaintiff's contract claim for incentive compensation also cannot support a breach of the covenant of good faith and fair dealing, because (1) defendants did not breach the Incentive Compensation Plan, as plaintiff was not entitled to incentive compensation under it, and (2) a contract for incentive compensation pursuant to the 8-27-03 Letter Agreement was never formed, as discussed <u>supra</u>.

## VI.  Intentional Infliction of Emotional Distress

### A.  Legal Standards

Plaintiff must show that (1) defendants acted intentionally or recklessly, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions were the proximate cause of the plaintiff's emotional distress, and (4) plaintiff's distress was so severe that no reasonable person could be expected to endure it to support a claim of IIED.  <u>Buckley v. Trenton Sav. Fund Soc'y</u>, 111 N.J. 355, 366 (N.J. 1988).  Plaintiff must prove

28

that the conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Id. (quotation and citation omitted).  "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not give rise to liability for IIED. Taylor v. Metzger, 152 N.J. 490, 509 (N.J. 1998) (quotation and citation omitted).

**B.   Legal Standards Applied Here**

Plaintiff alleges various claims as to Butler's conduct, and argues that these allegations lead to the conclusion that "this was a case that went beyond the usual give and take of office conflict." (Pl. Br., at 16-17; see, e.g., Am. Compl., at ¶¶ 26, 31-36, 38-39.)  Plaintiff also points to defendants' (1) actions during the process of his departure from KHES, and (2) subsequent refusal to offer plaintiff additional non-ERISA compensation as factual support for his IIED claim. (See Am. Compl., at ¶¶ 41-42, 44-47, 64-68.)  He also argues that these actions caused him severe emotional distress in the form of migraine headaches and anxiety, which he treated with medication. (Pl. Facts, at ¶ 172.)

The Court finds that defendants' conduct did not rise to the level necessary to maintain a claim for IIED here.  "[T]he limited scope of this tort tolerates many kinds of unjust, unfair

and unkind conduct." Fregara v. Jet Aviation Bus. Jets, 764
F.Supp. 940, 956 (D.N.J. 1991) (quotation and citation omitted).
Indeed, except in the case of aggravated discriminatory conduct,
"it is extremely rare to find conduct in the employment context
that will rise to the level of outrageousness necessary to provide
a basis for recovery for the tort of intentional infliction of
emotional distress." Cox v. Keystone Carbon Co., 861 F.2d 390,
395 (3d Cir. 1988) (applying Pennsylvania law); Griffin v. Tops
Appliance City, 337 N.J.Super. 15, 23-24 (App. Div. 2001).

     "The mere fact that the [d]efendants acted for an improper
purpose does not give rise to an actionable claim." Marrero v.
Camden County Bd. of Soc. Servs., 164 F.Supp.2d 455, 479 (D.N.J.
2001). Moreover, "allegations of sexual harassment,
discrimination, or improperly motivated discharge, cannot alone
provide the basis for an intentional infliction of emotional
distress claim." Id. (citations omitted). Also, claims
regarding employment decisions fail to state a claim as for
intentional infliction of emotional distress as a matter of law.
Borecki v. E. Int'l Mgmt. Corp., 694 F.Supp. 47, 61 (D.N.J.
1988).

     The Court further finds that plaintiff fails to allege or
make any showing that the defendants caused him emotional
distress so severe that no reasonable person could be expected to
endure it. Buckley, 111 N.J. at 366. Plaintiff's claim that he

suffered from migraine headaches and anxiety, without more, does not rise to this level.  See id. at 368 (concluding complaints of "aggravation, embarrassment, an unspecified number of headaches, and loss of sleep" insufficient to establish severe emotional distress); see also Lascurain v. City of Newark, 349 N.J.Super. 251, 280 (App. Div. 2002) (noting that for emotional distress to be sufficiently severe, dramatic impact on ability to function daily usually must be shown).

## VII. Unjust Enrichment

### A.    Legal Standards

A claim for unjust enrichment rests on the equitable principle that one shall not be allowed to be enriched unjustly at the expense of another.  Brauser Real Estate, LLC v. Meecorp Capital Mkts., LLC, No. 06-1816, 2008 WL 324402, at *7 (D.N.J. Feb. 4, 2008).  To establish an unjust enrichment claim, a plaintiff must show that (1) the defendant received a benefit from plaintiff, (2) the plaintiff expected remuneration from the defendant at the time the benefit was conferred on the defendant, (3) the failure of remuneration enriched the defendant beyond the contractual rights, and (4) to allow the defendant to retain that benefit without payment would be unjust.  Premier Pork L.L.C. v. Westin, Inc., No. 07-1661, 2008 WL 724352, at *14 (D.N.J. Mar. 17, 2008).

Liability based on unjust enrichment will not be imposed, however, if an express contract exists concerning identical subject matter.  <u>Id.</u>  The authority of an express contract will take precedence over a theory of unjust enrichment concerning the identical subject matter, since the parties are bound by their agreement, and there is no ground for implying a promise so long as a valid unrescinded contract governs the rights of the parties.  <u>Id.</u>

**B.  Legal Standards Applied Here**

Plaintiff alleges that defendants have been "unjustly enriched to the extent of the monies that it wrongfully failed to pay to plaintiff."  (Am. Compl., at ¶ 86.)  Plaintiff does not dispute that the basis for his unjust enrichment claim is that he (1) failed to receive (a) incentive compensation for work performed in the year 2003, (b) a separation payment of fifty-two weeks, and (2) was prevented from exercising some of his stock options.  (Def. Facts, at ¶ 174; Pl. Facts, at ¶ 174.)  Plaintiff also does not dispute that he has not provided any services for which he was not compensated.  (Def. Facts, at ¶ 173; Pl. Facts at ¶ 173.)  Nevertheless, plaintiff also argues that "[f]act issues sufficient to warrant a trial exist on this issue. [Plaintiff] was entitled to a bonus, which was a regular part of his compensation."  (Pl. Br., at 17.)

32

Plaintiff has conceded that he has not provided any services to defendants for which he has not been compensated.  (Def. Facts, at ¶ 173; Pl. Facts, at ¶ 173.)  Thus, his claim of unjust enrichment fails.  See Premier Pork L.L.C., 2008 WL 724352, at *14.  Further, plaintiff's claims related to incentive compensation, stock options, and separation benefits are governed by the plans and agreements discussed supra.  (See Admin. R., Plan, at D0118-31; 11-21-02 Stock Option Agreement, at D0034-36; 9-22-99 Stock Option Agreement, at D0040-41; Ventry Decl., Ex. J, 3-13-03 Equity Plan, Ex. L, Incentive Compensation Plan.)

## CONCLUSION

For the reasons stated supra, the Court will grant defendants' motion for summary judgment.  The Court will issue an appropriate order and judgment.


                                       s/ Mary L. Cooper
                                     **MARY L. COOPER**
                                     United States District Judge

**Dated:**   June 3, 2008